[No. 13268.   Department One.   December 29, 1916.]

J. H. MATTOCKS *et al.*, *Plaintiffs and Appellants*, v. GREAT NORTHERN RAILWAY COMPANY, *Defendant and Appellant*, P. GIBBONS *et al.*, *Defendants*.[1]

APPEAL—RECORD—STATEMENT OF FACTS—OFFICIAL STENOGRAPHER—STATUTES. Rem. Code, §§ 389 and 391, relating to the preparation by the appellant and the certification of a statement of facts on appeal, does not require the statement to be made up from the stenographic notes of the official court stenographer.

MINES AND MINING — CONTRACTS — GRUBSTAKE—PARTNERSHIP. A contract for prospecting and drilling for oil does not create a partnership, but shows, rather, a common venture in the nature of a "grubstake," in mining parlance, where the outfitter agreed to furnish drilling machinery and make advances for expenses, up to a certain limit, in consideration of which the prospector was to give a half interest in oil leases upon the discovery of oil in paying quantities.

SAME. In such a case, the nature of the contract is not changed by the fact that the operator had the right to obtain further advances from other parties in consideration of a proportional division of returns on the venture, after completion of the advances by the outfitter; and that would not create liability for obligations incurred by the prospector in the prosecution of the work.

JOINT ADVENTURES—CONTRACT. An arrangement in the nature of a grubstake whereby one party was to furnish drilling machinery and advances in consideration of a half interest in oil leases upon discovery of oil, is not a joint enterprise or undertaking to operate or develop joint property and divide proceeds, thereby creating a partnership; since there was no joint ownership of property.

PRINCIPAL AND AGENT — RELATION — AUTHORITY. A prospector's foreman in charge of oil drilling under a grubstake contract, with authority to hire men who, under the contract, were to be paid by the prospector, has no power to bind the outfitter by representations that the men were to look to the outfitter for their pay.

MECHANICS' LIENS—LABORER'S LIENS AGAINST LANDLORD — PROPERTY COVERED—REMOVABLE FIXTURES BELONGING TO ANOTHER. A portable drilling apparatus, a boiler built on its own carriage wheels, and a drilling machine fitted on a wagon bed with wheels, belonging to the outfitter under a grubstake contract, and not attached to the

[1]Reported in 162 Pac. 19.

soil, are not such fixtures as are coverable by liens of laborers against the leaseholds of the oil prospector employing the laborers, under the mechanics' lien laws; since the liens do not attach to property not belonging to the employer, although used by him in the work.

MECHANICS' LIENS — FORECLOSURE — DEFICIENCY JUDGMENT — PERSONS LIABLE. In an action to foreclose labor liens against the leaseholds of an oil prospector, for work done under a grubstake contract, the outfitter who furnished portable machinery for the use of the prospector cannot be made personally liable for either costs or attorney's fees, where it had no property to which the liens could attach and was not personally obligated to pay for the services.

Cross-appeals from a judgment of the superior court for Skagit county, Pemberton, J., entered July 14, 1915, upon findings in favor of the plaintiffs, in an action to foreclose mechanics' liens. Reversed on defendant's appeal.

*A. R. Hilen* and *Coleman & Gable*, for plaintiffs and appellants.

*F. V. Brown* and *F. G. Dorety*, for defendant and appellant.

FULLERTON, J. — On August 15, 1912, the defendant P. Gibbons entered into a verbal agreement with the Great Northern Railway Company by the terms of which he agreed to procure oil leases on certain lands in Skagit county and sink a well, at some place thereon to be selected by himself, for the purpose of exploring for oil, the railway company agreeing to furnish the machinery and other equipment necessary for driving the well and to furnish $600 in money to be expended for labor in the prosecution of the work. In consideration therefor, the railway company was to have an assignment from Gibbons of a one-half interest in the leases in case oil should be discovered on any part of the lands. In October, 1912, certain well drilling machinery owned by the railway company and then situated in North Dakota was shipped to Skagit county and placed in charge of Gibbons for operating purposes. Drilling began December 1, 1912, and continued under this oral agreement until February 25,

1913, when P. Gibbons and wife, as parties of the first part, entered into a written contract with the railway company, as party of the second part, which contract contained the following provisions:

"Whereas, party of the second part has already advanced to first party the sum of eight hundred eighty 75-100 dollars, and has furnished the use of a drill, all for the purpose of exploring for oil upon some of the lands above referred to, and said second party has agreed, and does hereby agree, to advance to first party the further sum of six hundred nineteen no-100 dollars, and to permit further use of said drill by first party until said sum to be advanced as aforesaid shall have been expended in the prosecution of said oil explorations;

"Now, Therefore, in consideration of the foregoing premises, party of the first part covenants and agrees with party of the second part as follows:

"(1) That said party of the first part will prosecute the work of exploring for oil upon some of the lands above referred to, and will employ all necessary labor and furnish all necessary materials in such manner and in such places as he shall deem most expedient, until he has expended in an efficient and economical manner, in the prosecution of said work, at least the sums advanced and to be advanced by party of the second part as aforesaid. Said labor and materials to be procured, and said work to be prosecuted upon the sole responsibility of party of the first part, and party of the second part to have no interest in, nor direction of, said work, except as hereinafter stated, and to incur no obligation, except as above stated, and party of the first part agrees to exonerate and save harmless party of the second part from any further obligations or expenses in connection with said operations.

"(2) Party of the first part further agrees that in case any oil, gas or other minerals shall be discovered in paying quantities in any of the properties covered by any of said leases procured or to be procured by party of the first part as aforesaid, he will thereupon and thereafter hold all of the leases above referred to, procured or to be procured as aforesaid, in trust for the joint use and benefit of himself and party of the second part, and will upon demand by party of the second part, assign to party of the second part, its suc-

cessors or assigns, an undivided one-half of all of the interest of party of the first part in and to any and all of said leases, and that party of the second part shall be entitled to one-half of the interest of party of the first part in any deposits of gas, oil or other minerals discovered in any of said properties.

"(3) The agreement of party of the second part to furnish the use of a drill as above provided shall be construed to include all necessary pipes and equipment to be used in connection with said drill, and it is understood that after party of the first part shall have expended the total sum of fourteen hundred ninety-nine and seventy-five one-hundredths ($1,499.75) dollars, advanced and to be advanced by party of the second part, as aforesaid, he shall be under no further obligation to prosecute the work of exploration or development at his own expense, but that if he should voluntarily choose to incur further obligations in said work the same shall be discharged by himself and not by party of the second part. The advancing of any further sums by party of the second part shall be at the option of party of the second part, and if advanced by party of the second part, shall be expended by party of the first part under the terms of this agreement.

"(4) In case the sums advanced as herein provided for, and any additional sums which party of the second part shall choose to advance for said work, shall have been expended without striking gas, oil or other minerals in paying quantities, and in case party of the second part shall decide not to advance any further sums to carry on said work, party of the first part shall have the right to advance further sums himself or to secure the advancement of further sums from other parties and to proceed with the expenditure of such further sums in the said work of exploration, and if thereafter oil, gas or other minerals shall be discovered in paying quantities, the rights and interests hereinabove created and provided for in favor of party of the second part shall be divided between party of the second part, its successors and assigns, and the party or parties advancing such further sums in proportion to the amounts theretofore advanced by party of the second part, and such other party or parties respectively and actually expended in said work of exploration and development."

The railway company had nothing to do with the hiring of any of the men employed upon the work, but during the time the work was continued and prior to May 1, 1913, it advanced all the money agreed to be advanced in the contract and nearly $1,300 additional, making a total advancement of $2,769.14. This sum covered all the operating expenses until May 1, 1913. At this time the Great Northern Railway Company notified Gibbons that it would make no further advancements, and advised Gibbons that, if he intended to work further, he must seek advances from other parties. Gibbons accordingly interested in the enterprise some Seattle parties, who made advancement between that time and December 1, 1913, in sums aggregating some $2,800 or $2,900. At this time the Seattle parties refused to advance further funds, and notified Gibbons to that effect. Gibbons, notwithstanding, continued the work until about the end of April, 1914. At the latter date, certain of the employees, including the plaintiffs in this action, had not been paid in full and, to secure payment, they filed liens upon the leasehold interests then standing in the name of Gibbons and on the well drilling outfit of the Great Northern Railway Company. On August 5, 1914, they began an action to foreclose the liens, filing a final amended complaint on December 2, 1914. In this complaint it was sought to hold the railway company personally liable on amounts due the plaintiffs which should not be paid by the sale of the property on which the liens were filed. The railway company took issue on the complaint and a trial was had, at the conclusion of which the court decreed the liens to be valid upon all of the property described therein and entered a decree foreclosing the liens, decreeing further that the plaintiffs have a personal judgment against P. Gibbons and wife for any deficiency that might remain after the sale of such property, and a personal judgment against the Great Northern Railway Company for attorney's fees and the costs of suit. From this decree, the plaintiffs appeal, assigning error on the refusal of the court to render a deficiency judg-

ment against the Great Northern Railway Company for the amount due the plaintiffs after the sale of the property beyond the costs and attorney's fees. The Great Northern Railway Company appeals from that part of the decree allowing the plaintiffs costs and attorney's fees against it and allowing a lien upon the drilling machinery used in drilling the prospecting well.

The Great Northern Railway Company, being the first appellant, prepared a statement of facts, serving it upon the plaintiffs, which the court afterwards certified. As a preliminary question, the plaintiffs moved to strike this statement, basing their motion on the ground that the evidence in the case had been taken by a stenographer other than the official court stenographer appointed for Skagit county. They urge that, since the legislature had provided for an official reporter, to be appointed after test of his ability and qualification and on his filing an oath and furnishing a bond, no statement of facts can be prepared other than by such official reporter; and since the evidence in the present case was taken by a stenographer employed by one of the parties and the statement of facts was compiled from his notes, it is not properly in the record.

The motion to strike is without merit. Under the code (Rem., § 389) it is provided that a party desiring to have a bill of exceptions or statement of facts certified must prepare the same as proposed by him, file it in the cause, and serve a copy thereof on the adverse party; that, within ten days after such service, any other party may file and serve on the opposing party any amendments which he proposes to the bill or statement; that either party may then serve upon the other a written notice that he will apply to the judge of the court before whom the cause is pending or was tried, at a time and place specified therein, to settle and certify the bill or statement. By § 391 it is provided that the judge shall settle the statement if the parties disagree as to the contents thereof, and shall certify that the statement embodies matters

and proceedings occurring in the cause and that the same are thereby made a part of the record, and, when such is the fact, shall further certify that the same contains all the material facts, matters and proceedings theretofore occurring in the cause and not already a part of the record therein. There is nothing in either this statute or the statute to which the plaintiffs refer which requires that the statement shall be made up from the notes of the official court reporter, or from notes of a reporter at all. Indeed, the appellant may make up the statement from his own notes or from any source and may have it certified, so long as it correctly states the testimony given at the trial of the cause. The notes of the official stenographer may furnish a convenient reference as to what the actual testimony was should the parties disagree, but such are nowhere made the only permissible official record, and the statute relied upon clearly does not repeal the statutes we have cited which provide the method of settling statements of facts. The motion is denied.

On the merits, the plaintiffs contend for a personal judgment against the defendant railway company, on the theory that a partnership existed between that defendant and P. Gibbons, and that, since the railway company never gave notice of the dissolution of the partnership, it is liable for any indebtedness contracted by Gibbons with parties who extended credit or furnished labor and materials to Gibbons on the belief in the existence of that relation. But we think that the plaintiffs are in error in their assumption that a partnership did exist between Gibbons and the railway company. The contract seems to us to show that the parties engaged in a common venture in the nature of that which in mining parlance is called a grubstake, whereby one of the parties undertakes to prospect for mineral and agrees to yield to the other, who furnishes money or supplies for the enterprise, a certain proportionate interest in any minerals discovered. It is true that the contract provides that, on the refusal of the railway company to advance further funds,

Gibbons shall have the right to advance further sums himself, or to secure the advancement of further sums from other parties and to proceed with the expenditure of such further sums in the prosecution of the work, and that, in case of discovery of oil, gas, or other minerals in paying quantities, the half interest in the lands created in favor of the railway company by the agreement shall be proportionately divided between the railway company and any new parties advancing funds for the exploration; but this does not change the nature of the contract from a grubstake contract to a mining partnership. By it the railway company simply sought to secure such interests as it might be entitled to because of the funds it should choose to advance. In other words, its rights should be fixed at the time it ceased to advance funds. But the clause did not render it liable for any obligations incurred by Gibbons in the prosecution of the work.

The plaintiffs argue further that the enterprise was a joint undertaking by two or more parties to operate or develop their joint property with an agreement to divide the proceeds, and that, by operation of law, this constitutes a partnership. If this were a correct interpretation of the agreement, the conclusion would perhaps follow, but we cannot accept it as a correct interpretation. There was no joint ownership of property or joint enterprise in the sense of two or more persons working property jointly owned by them. No oil well was in existence at the time the contract was entered into. The contract was, in its essence, nothing more nor less than an agreement whereby one person agreed to search for oil and the other agreed to furnish him with certain moneys and supplies in the prosecution of the search. None of the cases hold such a contract to be a partnership.

An illustrative case on the principle involved is *Prince. v. Lamb*, 128 Cal. 120, 60 Pac. 689, where it was held that an agreement whereby one advanced money to another to enable that other to go to Alaska and prospect, one-half of the mines or claims located and of minerals extracted to go to

the party making advances, did not constitute a mining partnership, but one only for a moiety of the property acquired. In *Hartney v. Gosling*, 10 Wyo. 346, 68 Pac. 1118, 98 Am. St. 1005, the contract was one where certain parties advanced $700 to one Young to enable him to prospect in Alaska for gold, and agreed to pay a monthly sum to his family for support during his absence, the parties advancing the money to have a specified interest in any mines discovered. While engaged in prospecting, Young located a claim and sank two shafts, but abandoned it as worthless. Later he found it necessary to borrow $500 to buy provisions, and the lender sought to hold the persons interested with Young, on the theory that the loan was to a mining partnership. The court held that the contract was merely a prospecting or grubstaking contract, and that no liability existed. In the course of the opinion, the court said:

"The agreement in this case definitely fixed the amount of money to be furnished to the prospector. The parties did not contract to supply him indefinitely with provisions and supplies. . . . It is evident that, by virtue alone of the agreement, he could have had no legal recourse upon them for more money to pay his personal expenses. We are unable to see how the contract can be extended by judicial construction to cover additional liability on the part of those furnishing the money portion of the capital for the common enterprise. To do so would, in effect, be equivalent to holding that when one has merely agreed to provide and does provide a definite sum of money to another, to use in prospecting for mineral, by that act alone he becomes bound for all expenses incurred by that other for personal supplies after, or even before, the sum originally furnished has been exhausted. We do not think that is the law. We have not been cited to any case announcing such a doctrine, and we are aware of no principle in the law that would authorize it."

This decision, we think, aptly fits the facts in the present case. The contracts in both instances are what may well be called grubstaking contracts. Such a contract is, in its usual scope, simply a common venture wherein one party, called

the outfitter, supplies the provisions and the other party, called the prospector, performs the labor, and all discoveries inure to the benefit of both parties in the proportion fixed by the agreement.   2 Lindley, Mines, § 858.

The evidence sufficiently shows that Maddocks, whom Gibbons placed in charge of the drill and who hired all the workmen, was conversant with the exact situation between Gibbons and the Great Northern Railway Company.  If he told the lien claimants, as some of them testified, that they were to look to the Great Northern Railway Company for their money, it was an assertion without basis and one beyond his authority to make.  We are clear, therefore, that the court did not err in refusing to hold the Great Northern Railway Company personally for the work and labor performed.

The Great Northern Railway Company on its appeal contends that the court erred in awarding a lien on its drilling apparatus employed in sinking the well.  The property sought to be held is described in the record in the following manner:

"One Star Machine, No. 26 Shop 2410, complete in all respect, together with derrick, engine, boiler, and all tools and all miscellaneous tools used in connection therewith:

920 feet 10-inch Clingo Special Pipe;
400 feet 12½-inch Clingo Special Pipe;
1 8-inch Swedge;
2 sets extra jars;
300 feet 6-inch line pipe or casing;
100 feet 8-inch line pipe or casing;
300 feet 3-inch line pipe or casing;
2,100 feet ⅞-inch Hercules line or cable;
2,000 feet ½-inch Hercules line or cable;
750 feet casing cable;
1 set triple blocks."

The evidence shows that the Star machine constituting the drilling apparatus mentioned in the description is a portable one not affixed to the leasehold in any manner.  The boiler was built on its own carriage wheels and was not removed

therefrom or attached to the soil in any way. The drilling machine was fitted on a wagon bed with wheels, the whole appliance being portable and for temporary use only. Clearly these were not such fixtures as attached to the soil and as are coverable by a lien upon the leasehold interest Gibbons had in the real property. The liens asserted in the present case against Gibbons could not attach to any personal property not owned by him although used in his drilling operations. The object of the mechanics' lien laws is to give the laborer or materialman, in addition to a personal right of action, a lien against any property owned by his employer and which was used in the work upon which he was engaged. In no case do such laws recognize the right to subject property of another to the lien when such property is not owned by the employer, although it may have been used in the work in which he was engaged. It follows that the claimants have no right of lien against any of the property herein described excepting the casing inserted in the well and which may properly be said to be a part of the realty.

Nor do we think the plaintiffs were entitled to a personal judgment against the Great Northern Railway Company for costs and attorney's fees. As we construe the contract, the Great Northern Railway Company had no property upon which the liens filed could attach, nor was it personally obligated to them in any way for the payment of their services. One or the other of these conditions must exist before there could be any recovery against the railway company, and since there was no right of recovery, there could be no obligation to pay either costs or attorney's fees.

The decree will be reversed, with directions to enforce it against the interests in the property of Gibbons and wife only, and for a judgment against them for any deficiency remaining after the sale of such property.

MORRIS, C. J., CHADWICK, MOUNT, and ELLIS, JJ., concur.